**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**


| | |
|---|---|
| **DAVID LENARD DUNTEMAN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 1:16-CV-05354** |
| **v.** ) | |
| ) | **Honorable Michael T. Mason** |
| **NANCY A. BERRYHILL, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant David Lenard Dunteman ("Claimant") brings this motion seeking review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Claimant's claim for disability insurance benefits under Sections 216(i) and 223(d) of the Social Security Act ("SSA"). The Commissioner filed a cross-motion for summary judgment, requesting that this Court uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Claimant's motion seeking review [17] is denied and the Commissioner's cross-motion for summary judgment [22] is granted.

## I. BACKGROUND

### A.    Procedural History

Claimant filed an application for disability insurance benefits on May 10, 2013 for disability allegedly beginning on March 1, 2009 with a date last insured of December 31,

2012. (R. 32, 174-75.) He alleges that he has been severely disabled due to atrial fibrillation, peripheral neuropathy, obesity, depression, anxiety, and alcohol abuse. (R. 15.) His application was initially denied on July 15, 2013, and again upon reconsideration on November 7, 2013. (R. 109-12; 115-17.) Claimant filed a timely request for a hearing on December 10, 2013. (R. 119-20.) On June 30, 2014, Claimant appeared with counsel before ALJ Lorenzo Level. (R. 27-80.) On October 31, 2014, the ALJ issued a decision denying Claimant's disability claim. (R. 13-22.) Claimant filed a timely request for review, and on December 10, 2013, the Appeals Council denied Claimant's request for review, which made the ALJ's decision the final decision of the Commissioner. (R. 1-9); *Zurawski v. Halter*, 245 F.3d. 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in the District Court.

**B.     Medical Evidence**

**1.    Treating Physicians**

**a.  Physical Treatment**

Claimant presented to the emergency room at Adventist LaGrange Memorial Hospital ("LaGrange Hospital") on September 5, 2008, after suffering a fall the day before that resulted in knee pain and bilateral foot neuropathy. (R. 334.) X-rays indicated fractures of the second and third metatarsal bases in his left foot. (R. 334-36.) Claimant was prescribed Vicodin and discharged home. (R. 332.) On September 10, 2008, Claimant was seen by Dr. Steven Mash at M & M Orthopaedics, who recommended a consultation for Claimant's neuropathy. (R. 453.)

Claimant had a follow-up visit with Dr. Mash on October 6, 2008, at which time the doctor commented that Claimant had neuropathy from the ankles downward. (R.

452.)  Dr. Scott Robertson at the Family Medical Group of LaGrange authored a progress note on February 20, 2009, stating that Claimant was unable to leave his house due to his severe depression and was considering disability because he could not work.  (R. 395.)  Dr. Robertson noted "he clearly cannot work as of now."  (R. 396.)  On March 3, 2009, Dr. Robertson's office documented that Claimant called to report that he was depressed.  (R. 393.)

On February 2, 2010, Dr. Robertson noted that that Claimant was looking for a job and taking care of his mother.  (R. 389.)  Claimant's depression was the same, but Tegretol helped.  (*Id.*)  Dr. Robertson's office received a call from a pharmacy on September 10, 2011, after Claimant told the pharmacist that he was experiencing chest pains because he did not have his medication.  (R. 388.)  The pharmacist was informed that Claimant had not been to the office since February 2010; he authorized a few tablets and instructed Claimant to make an appointment with Dr. Robertson.  (*Id.*)  Claimant presented for a follow up with Dr. Robertson on September 20, 2011 and reported experiencing atrial fibrillation about once a month.  (R. 386.)  Dr. Robertson noted that Claimant could not afford a cardiologist and ordered lab work.  (R. 387.)

Claimant was informed on September 23, 2011 that he needed to lose weight and abstain from drinking.  (R. 385.)  Claimant presented to Dr. Robertson on November 23, 2011 with a regular heart rate and rhythm.  (R. 383.)  It was recommended that Claimant see Dr. Meechai Tessalee, a cardiologist.  (R. 384.)

On February 8, 2012, Claimant underwent a transthoracic echocardiogram examination at Suburban Cardiologists, which identified mild concentric left ventricular hypertrophy, a mildly dilated left atrium, trace mitral regurgitation, and mild tricuspid

regurgitation.  (R. 353.)  A stress echocardiogram examination on February 15, 2012 found a severely reduced exercise capacity for Claimant's age, but also found normal resting wall motion and no stress-induced wall motion abnormality.  (R. 355.)

Claimant was referred to Dr. Alex Chicos, whom he saw on April 24, 2012.  (R. 344.)  Dr. Chicos reported that Claimant had episodes of paroxysmal atrial fibrillation every two weeks, including one episode that lasted four days.  (R. 344.)  Claimant also informed Dr. Chicos that he was unable to find work despite his experience as an accountant.  (*Id.*)  Due to Claimant's financial limitations, among other considerations, Dr. Chicos believed that "a pill in the pocket approach would be an excellent approach for him" and decided that flecainide was the best option.  (*Id.*)

On July 23, 2012, Claimant went to LaGrange Hospital complaining of a racing heart and palpitations.  (R. 306.)  He was found to have rapid atrial fibrillation, which resolved and he was discharged that same day.  (R. 309.)  Claimant was in sinus rhythm during a follow-up appointment with Dr. Tessalee on August 3, 2012.  (R. 341.)

Claimant presented to Dr. Robertson's office on September 20, 2012, complaining of rib pain from a fall ten days before.  (R. 381.)  He was prescribed Vicodin for the pain.  (R. 382.)  On October 12, 2012, he sought a refill for the Vicodin, and it was noted that he should not have needed the medication for that long.  (R. 377.)

On March 26, 2013, Dr. Robertson reported that Claimant appeared well, was not in distress, still presented with depression, and was on Prozac.  (R. 371-72.)  On May 30, 2013, and again on July 2, 2013, Claimant stated he was "more depressed because of his neuropathy" and reported "throbbing pain in all his body and increased neuropathy."  (R. 468, 470.)  During a March 7, 2014, appointment with Dr. Daniel Miller

at Loyola University Medical Center, it was noted that Claimant had "probable alcohol induced peripheral neuropathy." (R. 618.) He was prescribed diabetic shoes and custom molded multi-density insoles. (*Id.*)

On April 8, 2014, Claimant had a consultation with Dr. Khaled A. Dajani at the cardiovascular clinic at Loyola "to establish care for atrial fibrillation," which Claimant was diagnosed with ten years prior. (R. 622.) Dr. Dajani stated that Claimant was in sinus rhythm and recommended continued use of current medications. (R. 622, 625.)

### b. Mental Health Treatment

From March 17, 2009 to May 4, 2010, Claimant attended multiple sessions with Associates in Professional Counseling, usually attending one or two sessions per month.[1] (R. 281-97.) The discussions typically addressed Claimant's mood, his addiction, and concerns over his mother's health. (R. 286-297.) During his first session on March 17, 2009, Claimant stated that he felt depressed for the past four years, drank too much, and was unable to get motivated to seek work. (R. 284-85.) His symptoms were hopelessness, sadness, withdrawal, anger, and weight gain. (*Id.*)

During his September 1, 2009 session, Claimant expressed an inability to focus on work. (R. 291.) On November 3, 2009, his therapist noted that he appeared more in control, but was still depressed and had a lack of energy and focus. (R. 293.) On January 15, 2010, it was noted that Claimant was determined to do better in his coping efforts with his mom, who entered hospice the following month. (R. 295.) By the time of his final session on May 4, 2010, Claimant was withdrawing from his friends and expressed that he was stuck in a negative pattern. (R. 297.)

---

[1] The notes from the sessions are handwritten and difficult to decipher.

From March to July of 2013, Claimant attended regular psychiatric sessions with Dr. Ghassan Aldura. (R. 465-79.) At his initial appointment, Claimant reported that he had been unable to work for the past five years, that he was broke, and that he took care of his mother for the past 13 years until her death in October of 2010. (R. 476.) Claimant stated that he could not function and did not shower or leave the house. (*Id.*)

Claimant attended individual and group counseling through Pillars from April 23, 2013 through March 27, 2014. (R. 505-19.) He initially presented with a cooperative but helpless attitude and appeared unkempt. (R. 519, 523.) He expressed an interest in reintegrating himself into the world so that he could work. (R. 519.) He had stopped drinking in November 2012. (R. 530, 533.) He was diagnosed with major depressive disorder, severe without psychotic features and alcohol dependence, with physiological dependence, early full remission, and given a GAF score of 32. (R. 538.)

## 2. Agency Consultants

Dr. Vidya Madala completed a Disability Determination Explanation on July 12, 2013. (R. 88-96.) She determined Claimant has severe cases of cardiac dysrhythmias, essential hypertension, affective disorders, anxiety disorders, and a non-severe fracture. (R. 92.) His primary diagnosis was for recurrent arrhythmias, and his secondary diagnosis was for essential hypertension. (R. 97.)

A physical Residual Functional Capacity ("RFC") was completed, and it was documented that Claimant could: occasionally lift or carry 50 pounds; frequently lift or carry 25 pounds; stand, sit, or walk for a total of about six hours in an eight-hour workday. (R. 93.) It was also recommended he avoid extreme heat or cold. (R. 94.) Claimant's history of hypertension and atrial fibrillation substantiated the reasons for the

limitations described above, but "[t]here were no records to support his allegation of neuropathy." (*Id.*)  Claimant was therefore found to be not disabled.  (R. 95.)  A Disability Determination Explanation at the reconsideration level was completed on November 7, 2013, and it upheld the same findings as the July 2013 determination.  (R. 98-105.)

## C.    Claimant's Testimony

Claimant testified before the ALJ on June 30, 2014.  (R. 63-77.)  He testified that he was an accounting manager, and in that capacity he managed several employees and was responsible for $10-$15 million.  (R. 64.)  He lost his job in May of 2008 because his company "was bought out," and his position was offered to another person. (R. 72.)  His health was not a factor in why his job ended.  (*Id.*)  Claimant explained that he could not return to a job because he had difficulty concentrating due to depression. (R. 63.)

Claimant sought therapy beginning in March of 2009, but stopped seeing the psychologist after a year because he was not "getting any benefit out of it."  (R. 63.)  He engaged in significant alcohol abuse prior to November of 2012 to help him deal with his depression and would consume an entire fifth of liquor on some days.  (R. 64-65.)  He decided to drastically reduce his alcohol consumption because he realized that alcohol worsened his depression.  (*Id.*)  In April of 2014, he consumed half a gallon of vodka over a three-day period because his "feet hurt terribly and the medication was not working."  (R. 65-66.)  Prior to that, his last drink was in December of 2013.  (R. 66.)

Claimant testified that he was on three psychotropic drugs and that they, along with decreased drinking, were improving his mood.  (*Id.*)  He noted that previously, he

would not leave the house for two weeks at a time, open the draperies, change his clothes, or bathe. (*Id.*) However, despite his mood improvements and increased capacities, Claimant testified that he could not return to being an accountant because his "mind [was] not capable of the quick decisions that are necessary to do the number work that [he] used to do." (R. 67.) He opined that there was no work requiring mental focus that he could do presently. (*Id.*)

Claimant testified that he experiences the pain from neuropathy from his ankles down to his toes, specifically noting that his toes were about 98% numb and his feet were about 95% numb. (*Id.*) All he felt in his toes and feet was "a constant throbbing, painful, stinging numbness with every heartbeat." (*Id.*) This has been the case since he first went to a neurologist in January 2009. (*Id.*) His pain has not decreased with his decreased drinking. (*Id.*)

Claimant testified he can only stand on his feet for fifteen minutes before his feet begin to ache and he experiences balance issues. (*Id.*) He can only walk about two blocks before he has to sit down and rest. (R. 69.) Furthermore, he must sit for an hour before he can stand up again. (R. 68.) In order to alleviate the pain from standing or walking, he sits down and puts his feet up. (R. 70.) He does not have difficulty driving, but he does use both feet. (R. 69.)

Claimant explained that at the beginning of the day his foot pain is a two out of ten, and it reaches an eight out of ten at the end of each day. (*Id.*) Because he suffers from significant foot pain, he spends most of his day sitting, reading, and watching television. (R. 71.) He testified that he cannot spend more than a combined hour a day on his feet. (*Id.*) He does some housecleaning, gets the mail, takes care of his cats,

and goes grocery shopping, but needs to put his feet up as soon as he gets home.  (R. 71-72.)

Claimant then discussed an instance when he had a foreign object in his foot, but he did not discover the object until he had an X-ray taken because of the numbness. (R. 69.)  Doctors decided not to operate because his neuropathy was permanent; and the numbness in his feet could result in a failure to detect an infection after surgery, which could cause serious damage.  (R. 70.)

At the recommendation of his psychologist, Claimant volunteers at a thrift shop one day a week for three hours to help him cope with his depression.  (R. 73.)  He sorts clothes and hangs them on a rack, but states he can only complete those tasks because he can sit while he works.  (*Id.*)  Claimant also explained that while he went to four group therapy sessions, he attended at least 40 one-on-one counseling sessions at Pillars.  (R. 71.)

Claimant testified he could not work full time in a job comparable to his capacity as a volunteer sorting clothes while seated because he "can't sit that long" and has "to put [his] feet up," which he could not do while he hangs clothes.  (R. 74.)  After an hour of sitting with his feet on the ground, Claimant testified that he needs to get up and walk around for a few minutes.  (*Id.*)  Claimant also had a history of falling and injuring parts of his body, including a broken leg and ribs, but testified to a significant reduction in falls after receiving a prescription for Tegretol five years earlier.  (R. 75.)

## D.    Medical Expert's Testimony

Medical Expert Laura Rosch (the "ME") also testified at the June 30, 2014 hearing.  (R. 31-47.)  After reviewing the record, ME Rosch testified that Claimant has a

history of peripheral neuropathy (possibly secondary to alcohol abuse), asthma, obesity, hypertension, an extensive history of depression, and atrial fibrillation. (R. 33.) ME Rosch did not consider the arrhythmia, hypertension, and atrial fibrillation to be severe as none of them resulted in end-organ damage and the atrial fibrillation was being treated medically. (R. 34.) She concluded that Claimant's medical issues did not justify receipt of benefits. (*Id.*)

ME Rosch further testified that Claimant could occasionally lift 20 pounds and frequently lift 10 pounds. (*Id.*) ME Rosh concluded that Claimant could stand six out of eight hours in an eight-hour day because there is no evidence of motor atrophy or motor loss. (R. 34, 40.) Due to his neuropathy and obesity, Claimant would be restricted from using ladders, ropes, and scaffolding; could occasionally use ramps and stairs; could occasionally stoop, bend, kneel, crawl, crouch, and balance; and would be restricted to pulmonary irritants due to his asthma. (R. 34-35.)

Claimant's attorney then examined ME Rosch, first discussing Claimant's falls and neuropathy. ME Rosch concluded that the record does not support a connection between Claimant's neuropathy and falls on a chronic, consistent basis. (R. 38.) Based on ME Rosch's review of the record, "alcohol is certainly a contributing factor" to Claimant's neuropathy. (R. 46.)

## E.  Psychological Expert's Testimony

Psychological Expert Kathleen O'Brien (the "PE") also testified at the June 30, 2014 hearing. (R. 47-63.) PE O'Brien diagnosed Claimant with major depressive disorder, severe, without psychotic features. (R. 48.) Based upon the facts in the record, she also concluded that Claimant suffers from alcohol abuse. (R. 49.)

When Claimant abuses alcohol, PE O'Brien testified that "he has marked difficulties with activities of daily living, marked difficulties in social functioning, [and] marked difficulties with concentration, persistence, and/or pace." (R. 49-50.) She concluded that he "wouldn't meet the C criteria." (R. 50.)

When Claimant does not abuse alcohol, PE O'Brien testified that he "would have mild difficulties with activities of daily living from a mental health perspective, moderate difficulties in social functioning; and mild difficulties with concentration, persistence, and pace." (*Id.*) Once again, Claimant still would not meet the C criteria. (*Id.*)

Claimant's attorney then examined PE O'Brien, who agreed that "the record is quite clear that [Claimant] had an ongoing problem with alcohol." (R. 54.) She concluded that the two instances in the record where Claimant consumed alcohol after November 2012 were evidence that Claimant had relapsed. (R. 56.) Additionally, PE O'Brien testified that Claimant's remission would affect him psychologically given his history of drinking. (R. 57-58.)

## F. Vocational Expert's Testimony

Vocational Expert Brian Harmon (the "VE") also testified at the June 30, 2014 hearing. (R. 77-84.) VE Harmon categorized Claimant's past work as a manager, industrial organization, and described it as light, skilled work. (R. 78.) The ALJ posed a hypothetical to the VE, describing an individual of the same age, education, and work experience as Claimant and limited to the sedentary exertion level. (R. 79-80.) VE Harmon explained that the hypothetical would eliminate past work, but that certain skills would be transferrable, such as judgment and decision-making, management of financial resources, and clerical skills. (R. 79.) VE Harmon further opined that such a

person could complete the following semi-skilled jobs: receptionist (20,000 in the region), an order clerk (4,000 in the region), and a data entry clerk (3,500 in the region). (R. 80.)

The ALJ then added that the hypothetical individual could occasionally balance, stoop, kneel, crawl, climb ramps and stairs; could never climb ladders or scaffolds; and could frequently interact with other individuals. (*Id.*) VE Harmon stated that would not change the jobs he identified. (*Id.*) The ALJ then posed another hypothetical, describing an individual with the residual capacity to perform light work; could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but could never climb ladders, ropes, or scaffolds; could "understand, remember, and carry out simple instructions and perform simple tasks"; and could "interact with the public, coworkers, and supervisors." (R. 81.) VE Harmon concluded that this hypothetical person could not perform Claimant's past work "due to the limitation of understanding simple instructions and tasks." (*Id.*) However, examples of jobs this hypothetical individual could perform at the unskilled, light exertion level included serving as a housekeeper (5,000 in region), sorter (500 in region), inspector (500 in region), and a mail clerk (2,000 jobs in region). (R. 81-82.)

When examined by Claimant's attorney, VE Harmon stated that someone who could only stand or walk for fifteen minutes at a time could only work at the sedentary exertion level. (R. 83.)

## II. LEGAL ANALYSIS

### A.    Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). We must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to h[is] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate h[is] assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## B.  Analysis under the Social Security Act

In order to qualify for disability insurance benefits or supplemental security income, a claimant must be "disabled" under the SSA. A person is disabled under the

SSA if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed the five-step analysis. At step one, the ALJ found that Claimant was not engaged in substantial gainful activity and had not been engaged in substantial gainful activity during the period from his alleged onset date of March 1, 2009, through his date last insured of December 31, 2012. (R. 15.) At step two, the ALJ found that Claimant had the following severe impairments: atrial fibrillation, peripheral neuropathy, obesity, depression, anxiety, and alcohol abuse. (*Id.*) At step

three, the ALJ found that the Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

At step four, the ALJ found that Claimant has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) that does not require climbing ladders, ropes, or scaffolds. (R. 16.) The ALJ further found that Claimant can occasionally climb ramps and stairs as well as occasionally balance, stoop, kneel, crouch, and crawl. (*Id.*) The ALJ also found that Claimant must avoid concentrated exposure to extreme heat and extreme cold; is able to understand, remember, and carry out simple instructions and perform simple tasks; and can have frequent interaction with the public, coworkers, and supervisors. (*Id.*) At step five, the ALJ found that the Claimant was unable to perform any past relevant work through the date last insured, but also considered Claimant's age, education, work experience, and RFC to find that jobs existed in significant numbers in the national economy that the Claimant could have performed. (R. 20-21.) The ALJ also found that transferability of job skills was not material to the determination of disability because Claimant was not disabled using the framework of the Medical-Vocational Rules. (R. 20.) As a result, the ALJ found that Claimant was not under a disability at any time from March 1, 2009 through December 31, 2012. (R. 21.)

Claimant argues that the ALJ erred in evaluating his subjective allegations according to SSR 16-3p and SSR 96-7p, erred in evaluating his mental impairments, and erred in evaluating his physical RFC.

**C.  The ALJ's Subjective Symptom Evaluation is Supported by Substantial Evidence.**

Claimant first contends that the ALJ erred in evaluating Claimant's subjective allegations according to Social Security Ruling ("SSR") 16-3p and 96-7p. The Social Security Administration (the "Administration") recently updated its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "more closely follow [the] regulatory language regarding symptom evaluation" and to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1; *Cole v. Colvin,* 831 F.3d 411, 412 (7th Cir. 2016) ("The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character.") Though SSR 16-3p post-dates the ALJ hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where the new regulation is a clarification of, rather than a change to, existing law. *Pope v. Shalala*, 998 F.2d 473, 482-483 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999). Therefore, it is appropriate to evaluate Claimant's descriptions of her subjective symptoms pursuant to both existing case law and the guidance the Administration has provided in SSR 16-3p.

As before, under SSR 16-3p, the ALJ must carefully consider the entire case record and evaluate the "intensity and persistence of an individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 16-3p, 2016 WL 1119029 at *2. Whenever an individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must

make a finding based on a consideration of the entire case record, including "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* The ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *Goble v. Astrue,* 385 Fed. Appx. 588, 593 (7th Cir. 2010). However, the ALJ need not mention every piece of evidence so long as he builds an accurate and logical bridge from the evidence to his conclusion. *Id.* In making a credibility determination, the ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight v. Chater,* 55 F.3d 309, 314 (7th Cir. 1995).

SSR 16-3p requires the ALJ to consider the following factors in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness and side effects of medication; (5) any treatment, other than medication, for relief of pain or other symptoms; (6) any measures the claimant uses to relieve the pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 2016 WL 1119029, at *7. The Court will only reverse the ALJ's credibility finding if it is "patently wrong." *See Powers v. Apfel*,

207 F.3d 431, 435 (7th Cir. 2000). The ALJ's credibility determination is patently wrong if it lacks "any explanation or support." *Elder*, 529 F.3d at 413–14.

Here, despite Claimant's contention that the ALJ did not follow SSR 16-3p in giving specific reasons for the weight given to the individual's symptoms, we find that the ALJ adequately weighed the evidence consistently and clearly explained the reasons for his decision. The ALJ found that Claimant's testimony regarding the frequency and severity of his symptoms was not fully credible or supportive of any greater limitations or restrictions than what was included in the ALJ's RFC assessment. In making his subjective symptom determination, the ALJ considered a variety of factors, including that: Claimant sufficiently maintains his activities of daily living; his echocardiogram and stress echocardiogram were normal; medical expert opinions did not support Claimant's allegations of physical and mental disorders; Claimant demonstrated intact memory and concentration and normal interaction with health providers; and Claimant was able to work one day a week despite his alleged disabling symptoms. The ALJ also considered the medical opinions in the record concerning Claimant's abilities and limitations. (R. 18-21.)

Claimant looks to *Parker v. Astrue* to suggest that the ALJ's determination that Claimant is "not entirely credible" is "meaningless boilerplate" that "yields no clue to what weight the trier of fact gave the testimony." 597 F.3d 920, 922 (7th Cir. 2010). However, the ALJ provided specific reasons for his finding, satisfying the requirement that he "may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942. The examples enumerated above are just some of the factors the ALJ considered in making his determination.

Contrary to the Claimant's suggestion, the ALJ's subjective symptom determination contains specific reasons supported by the evidence in the record. The ALJ properly followed the two-step process in considering the evidence of Claimant's symptoms, including (1) a determination of an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce Claimant's pain or other symptoms; and (2) an evaluation of the impairment(s) in terms of its intensity, persistence, and limiting effects of Claimant's symptoms to determine the effect of its impact on Claimant's functioning. SSR 16-3p, 2016 WL 1119029, at *2-4. In following this two-step process, the ALJ first outlined Claimant's daily activities as discussed in the record. The ALJ also evaluated how Claimant's impairments impacted his functioning, finding that Claimant only stopped working when his job was eliminated and that, despite his reported psychological symptoms, his memory was intact and his concentration was within normal limits.

Moreover, the ALJ noted that Dr. Robertson's records in 2010 and 2011 indicated that Claimant was not in distress, and a cardiac evaluation revealed no abnormalities. An emergency room visit in 2012 due to shortness of breath revealed atrial fibrillation, but the condition was treated and resolved. (*Id.*) During testimony, Dr. Rosch provided limitations to Claimant's activities, including the ability to sit, stand, and walk six out of eight hours in a workday, the ability to occasionally lift twenty pounds and frequently lift ten pounds, and an inability to climb ladders, ropes, and scaffolds as well as limited climbing of ramps and stairs. (R. 19.) The ALJ's specific discussion and consideration of all these factors demonstrates a reasonable conclusion where he

determined that Claimant had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b).

After considering the foregoing evidence, the ALJ stated that Claimant's atrial fibrillation does not meet the requirements for cardiovascular disease as the record does not demonstrate uncontrolled or recurrent arrhythmias despite prescribed treatment. The Claimant also did not meet the requirements for peripheral neuropathy as he did not have a disorganization of motor function despite his prescribed treatment. The ALJ further found that Claimant's obesity, although significantly affecting his ability to perform work-related functions, did not meet the requirements of any medical listings per SSR 02-1p. Finally, the ALJ determined that Claimant's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and one "repeated" episodes of decompensation as required by the paragraph B criteria, and that the record also failed to establish the presence of paragraph C criteria.

Claimant further argues that the ALJ erred when he acknowledged that Claimant had a "severely reduced exercise capacity for Claimant's age," but failed to address the significance of this finding. (Motion at 10.) While it is true that Claimant was found to have a reduced exercise capacity, none of the medical evidence Claimant identifies in his brief establishes the severity or functional limitations resulting from these impairments. A mere diagnosis does not establish functional limitations, severe impairments, or an inability to work. *Stamps v. Astrue*, 09 CV 7026, 2010 WL 5149284, *21 (N.D. Ill. 2010) (citing *Anderson v. Sullivan*, 925 F.2d 220, 222 (7th Cir. 1991)); *see also, Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005) ("A person can [have various physical or mental diagnoses] yet still perform full-time work."). Accordingly, given the

record before the Court, the ALJ's subjective symptom finding was based on a consideration of the entire case record and was not in error.

**D.     The ALJ Complied with 20 C.F.R. 404.1520a.**

Claimant next argues that the ALJ erred in evaluating Claimant's mental impairments because he failed to evaluate the severity of Claimant's impairments under 20 C.F.R. 404.1520a by specifying symptoms, signs, and laboratory findings that determine whether there is a medically determinable mental impairment.  However, Claimant failed to fully consider the entire regulation, which refers the ALJ to 20 C.F.R. 404.1521 "for more information about what is needed to show a medically determinable [mental] impairment."  20 C.F.R. 404.1520a(b)(1).  The regulation states that a Claimant's "impairment(s) must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. 404.1521.  The regulation continues that the ALJ "will not use [a claimant's] statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).  After [an ALJ] establish[es] that [a claimant has] a medically determinable impairment(s), then [the ALJ] determine[s] whether [the claimant's] impairment(s) is severe."  *Id.*

Here, the ALJ found that both the record and Claimant himself fail to demonstrate a medically determinable mental impairment that is severe, meaning that the ALJ was not required to specify the symptoms, signs, and laboratory findings to substantiate the presence of an impairment.  20 C.F.R. 404.1520a(b)(1) (stating that **if** the ALJ determines "that [a claimant] ha[s] a medically determinable mental impairment(s), [h]e must specify the symptoms, signs, and laboratory findings that substantiate the

presence of the impairment(s) and document our findings in accordance with paragraph (e) of this section."). If an ALJ finds a medically determinable combination of impairments to be "severe," he must significantly limit an individual's ability to perform basic work activities. 20 C.F.R. 404.1520(c). However, the Seventh Circuit has explained that "deciding whether impairments are severe . . . is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process *as long as there exists even one severe impairment*." *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) (*citing Castile v. Astrue*, 617 F.3d 923, 927-28 (7th Cir. 2010)) (emphasis added). The ALJ considered the severity of Claimant's mental impairments, and concluded that Claimant did not meet or medically equal the criteria listings of 12.04, 12.06, and 12.09 because he did not meet the requirements that he suffer from two marked limitations or a marked limitation and repeated episodes of decompensation. Instead, the ALJ found that Claimant had mild restrictions in his activities of daily living, moderate difficulties in social functioning, moderate difficulties with concentration, persistence, or pace, and that he did not experience any episodes of decompensation.

Furthermore, even if the ALJ found that Claimant's mental impairments were severe enough to justify an analysis under the technique described in 20 C.F.R. 404.1520a, the ALJ still satisfied the requirements in the analysis provided. It is well settled that a treating physician's opinion is entitled to "controlling weight" only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). "An ALJ must minimally articulate h[is] reasons for discounting a treating source's opinion." *Dampeer*

*v. Astrue*, 826 F. Supp. 2d 1073, 1082 (N.D. Ill. Oct. 21, 2011) (internal quotations omitted). Here, the ALJ weighed the medical evidence and explained what he considered in providing ratings in daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation. Considering the record and evidence, the ALJ found that, "[d]espite the reported [physical and mental] symptoms, [Claimant's] memory was described as intact, and concentration was described as being within normal limits. Rapport was easily established." (R. 18.) The ALJ further observed that "Dr. Robertson's records indicated that when the Claimant was seen in February 2010 the Claimant was in no distress, oriented and had a normal mood and affect." (*Id.*) Once again on September 20, 2011, no psychological abnormalities were noted, and a follow-up on November 23, 2011 again noted no psychological abnormalities. (*Id.*) The ALJ also looked to testimony from Dr. O'Brien, who noted that Claimant's depression was chronic and long-standing. (R. 19.) Furthermore, the ALJ also properly used his discretion to determine instances when medical statements were not entirely consistent with the record. For example, he noted that "Dr. O'Brien's statements related to the Part B criteria when alcohol abuse is considered are not entirely consistent with the evidence of record" because Claimant was still noted to have demonstrated intact memory, concentration and normal interactions with healthcare providers during the timeframe in which he was drinking heavily. (R. 20.)

The record before the Court indicates that the ALJ did not simply rely on his own unsupported judgments to determine whether Claimant's mental impairments were severe. The evidence the ALJ discussed above and the reasoning provided for accepting or discounting pieces of evidence justifies the ratings he provided when he

concluded that Claimant had mild restrictions in activities of daily living, moderate difficulties in social functioning, and moderate difficulties with regard to concentration, persistence, or pace.  (R. 16.)

Claimant also contends that the ALJ did not have a reasonable medical or non-medical basis for the mental RFC finding that Claimant was capable of understanding, remembering, and carrying out simple instructions and performing simple tasks and being able to have frequent interaction with the public, coworkers and supervisors.  In assessing a claimant's RFC, an ALJ will consider all of the relevant medical and other evidence in the record, including evidence of impairments that are not severe.  20 C.F.R. 404.1545(a)(1); *Craft*, 539 F.3d at 676.  The RFC assessment must contain a narrative discussion describing how the evidence supports the ALJ's conclusions and explaining why any medical source opinion was not adopted if the ALJ's RFC assessment conflicts with such an opinion.  SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996); *accord Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).  A court will uphold an ALJ's decision "if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review." *Arnett*, 676 F.3d at 591-92 (citing *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008)).

An evaluation of the ALJ's opinion provides sufficient explanation for his mental RFC finding.  Claimant's suggestion that Dr. Aldura's notes describing Claimant's poor hygiene and distracted thought process had been omitted from the ALJ's opinion is inaccurate.  The ALJ enumerated those factors among many others, stating that Claimant "reported a history of not leaving the house for two weeks, not bathing or

open[ing] the curtains. He [also] had difficulty concentrating and making quick decisions." (R. 17.) Also contrary to Claimant's suggestion, the ALJ did explain how he reached the mental RFC conclusions detailed above for Claimant. Among the many factors the ALJ enumerated, he considered Claimant's ability to live "alone accomplishing needed tasks within the home, including taking care of a pet, and he left his home 3-4 times a week on average to accomplish needed activities." (R. 20.) Claimant also demonstrates an ability to work and follow simple instructions as he spends one day a week performing volunteer work at a gift shop sorting and hanging clothes. The evidence provided by the ALJ demonstrates sufficient consideration of the factors that led to his mental RFC finding.

**E.      The ALJ's RFC Assessment is Supported by Substantial Evidence.**

Lastly, Claimant contends that the ALJ failed in not considering the effect of his obesity in combination with his neuropathy when the ALJ assessed Claimant's RFC. The RFC is the most a claimant can still do despite his limitations. 20 C.F.R. § 416.945(a)(1). As previously noted, in making the RFC determination, the ALJ will consider all of the relevant medical and other evidence in the record, including evidence of impairments that are not severe. 20 C.F.R. § 416.945(a)(3); *Craft*, 539 F.3d at 676. "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence." *Arnett*, 676 F.3d at 592.

Here, Claimant contends that the ALJ failed to consider the interaction between Claimant's obesity and his neuropathy. Claimant further argues that the ALJ failed to

resolve the conflict between the ME's testimony about Claimant's 2014 fall, in which the ME did not clarify whether she assumed that Claimant's fall was due to alcoholism.

The Commissioner asserts that the ALJ accounted for Claimant's obesity and neuropathy when limiting Claimant to a range of light work. The ALJ remarked that Dr. Rosch noted falls in Claimant's history, but did not find that the record objectively established that falls existed in a chronic and consistent basis, specifically due to neuropathy. Moreover, the 2014 fall referenced by Claimant in his motion occurred after the date last insured. *See Estok v. Apfel,* 152 F.3d 636, 638 (7th Cir. 1998) (A claimant must provide evidence of a disability before his date last insured.).

Additionally, the ALJ noted that Dr. Rosch answered questions about Claimant's obesity and neuropathy impairments and continued to maintain that he was able to stand and walk six out of eight hours. Dr. Rosch further opined that given Claimant's neuropathy and obesity, he would be restricted from using ladders, ropes, and scaffolding; could occasionally use ramps and stairs; and could occasionally stoop, bend, kneel, crawl, crouch, and balance. In discussing Claimant's RFC, the ALJ commented that Dr. Rosch did not see any EMG reports or medical examination findings that would suggest an inability to stand or walk for the six hours, such as motor loss or atrophy. Accordingly, we find that the ALJ properly considered the record and medical testimony, and properly assessed Claimant's obesity when determining Claimant's RFC. *See Schmidt v. Astrue*, 496 F.3d 833, 845-46 (7th Cir. 2007) (ALJ need only include in the RFC those limitations the record supports).

## III. CONCLUSION

For the reasons set forth above, Claimant's motion is denied and the

Commissioner's cross-motion for summary judgment is granted. It is so ordered.


**ENTERED:**

_____
**Michael T. Mason**
**United States Magistrate Judge**


**Dated: October 24, 2017**